1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          SOUTHERN DISTRICT OF CALIFORNIA
10
11   PRUCO LIFE INSURANCE                    Case No.:  3:18-cv-02280-DMS-AHG
     COMPANY,
12                                           **ORDER REGARDING SANCTIONS**
                                Plaintiff,
13
     v.
14
     CALIFORNIA ENERGY
15   DEVELOPMENT INC., *et al.*,
16                               Defendants.
17
18
19
20
21
22
23
24
25
26
27
28

1

## I.      BACKGROUND

As discussed in the Court's previous Order Setting Further Show Cause Hearing Against John Walsh and Mickey Nicholson and Calling Leon-Qiyam Pogue as the Court's Own Witness (ECF No. 289), the Court held a Show Cause Hearing against Mickey Nicholson on August 9, 2021, to investigate the allegation made by John Walsh at his own July 13, 2021 Show Cause Hearing that Mr. Nicholson is responsible for certain false statements submitted to the Court. The false statements at issue are contained in Mr. Walsh's Motion for Order to Show Cause and attached Declaration (ECF No. 215) ("the Motion for OSC"). *See* ECF Nos. 262, 271, 276, 278. The same false statements are also contained in Mr. Walsh's Response in Opposition to Life Advance's Motion to Enforce Settlement Agreement and supporting Declaration (ECF No. 213) ("Walsh Opposition"), which is substantially similar to the Motion for OSC.[1] Both the Motion for OSC and the Walsh Opposition were received by the Court on December 14, 2020, forwarded to the undersigned's chambers on December 22, 2020, and accepted for filing on December 23, 2020. *See* ECF Nos. 212, 214.

Pursuant to the Court's original Order to Show Cause against John Walsh (ECF No. 262), which the Court issued upon discovery of the false statements in the Motion for OSC and Walsh Opposition, counsel for Life Advance, LLC ("Life Advance") filed a Declaration detailing the costs and attorney fees incurred in briefing and attending hearings related to the Motion for OSC and Life Advance's Motion to Enforce Settlement Agreement, including the time spent preparing the Declaration itself. ECF No. 267. In the Declaration, counsel reports that Life Advance incurred attorney fees in the amount of $12,075 in connection with its Motion to Enforce Settlement Agreement, and $19,140 in connection with the Motion for OSC, for a total of $31,215. *Id.* at 3-4. In addition, Life Advance incurred $2,110 in connection with reviewing the services performed, preparing

---

[1] Indeed, ¶¶ 2-23 of the Walsh Declarations attached to the Walsh Opposition and the Motion for OSC are identical. *Compare* ECF No. 213 at 15-23 *with* ECF No. 215 at 9-15.

the Declaration, and corresponding with Mr. Walsh to schedule an interview in compliance with the settlement agreement between Life Advance and Mr. Walsh.[2] *Id.* at 4. Finally, Life Advance reported costs in the amount of $317.43. *Id.* at 5. Therefore, the total amount of fees and costs reported by Life Advance is $33,642.43.

After Mr. Walsh testified at his July 13 Show Cause Hearing that Mr. Nicholson was responsible for providing him with the Motion for OSC containing the false statements at issue, the Court issued a second Order to Show Cause against Mr. Nicholson, ordering him to appear for a hearing on August 2, 2021 to answer Mr. Walsh's allegation, and to show cause why he should not be required to pay some or all of the fees and costs Life Advance incurred in connection with the frivolous filings. ECF No. 276.

Mr. Nicholson filed a written response to the Order to Show Cause against him on July 30, 2021. ECF No. 281. In Mr. Nicholson's response, he asserts he had no role in drafting the Motion for OSC and contends that Mr. Walsh is suffering from serious cognitive declines that affect his memory. Mr. Nicholson theorizes that due to these memory issues, Mr. Walsh has confused a visit that Mr. Nicholson made to his home in October 2020 to obtain Mr. Walsh's signature on a resignation letter from California Energy Development, Inc. ("CEDI") with a visit to his home to obtain his signature on the Motion for OSC. *Id.* at 6-9.

The August 2 Show Cause Hearing against Mr. Nicholson was subsequently continued to August 9, after Mr. Nicholson failed to timely appear due to a family medical emergency. ECF No. 282. During the August 9 hearing, the Court placed both Mr. Walsh and Mr. Nicholson under oath and took testimony from both litigants. ECF No. 293. Mr. Nicholson again denied having any role in drafting or filing the documents that Mr. Walsh filed with the false statements. *See* August 9 Show Cause H'rg Tr. ("Aug. 9 Tr."), ECF No. 293 12:18-13:7. Although Mr. Walsh frequently veered off-topic and gave testimony that

---

[2] Life Advance's interview of Mr. Walsh has now taken place and this issue is resolved.

was difficult to follow, he consistently maintained that he paid Mr. Nicholson $7,500 to have someone prepare the Motion for OSC. Aug. 9 Tr. 26:19-25. Mr. Nicholson confirmed that he received a $7,500 check from Mr. Walsh in the past year, but contended it was for an investment in one of his companies, and not a payment to prepare legal documents in this case. Aug. 9 Tr. 35:1-20. In connection with the August 9 hearing, Mr. Walsh also produced two separate series of text message exchanges, one with Mr. Nicholson and another with Leon-Qiyam Pogue. Mr. Pogue is a legal document preparer, whom Mr. Walsh had previously misidentified as "Leon Pique" and whom he also called "Q." Mr. Walsh had previously testified that Mr. Pogue was the person responsible for preparing the Motion for OSC at a June 1, 2021 hearing before the Court, but testified at the July 13, 2021 hearing that he had paid Mr. Nicholson—and not Mr. Pogue—to prepare (or to have someone else prepare) the document with the false statements. *See* ECF No. 278, July 13 Show Cause Hr'g Tr. ("July 13 Tr.") 3:19-21.[3]

After the August 9 Show Cause Hearing, the Court determined that it still did not have sufficient evidence to decide whether to impose sanctions on either Mr. Walsh or Mr. Nicholson in connection with the false filings. The Court set a supplemental production deadline of August 23, 2021 for Mr. Walsh to provide a copy of the $7,500 check that he testified he gave to Mr. Nicholson, and for Mr. Nicholson to complete the document production that he had previously been ordered to complete before the Show Cause Hearing, including all written communications between Mr. Nicholson and any other person (1) related to Mr. Walsh's Motion for OSC and Declaration; or (2) regarding Mr. Walsh's membership on the board of CEDI, his resignation from the board of CEDI, or his

---

[3] The Court: So who actually prepared the statements in your declaration?

Mr. Walsh: Mickey Nicholson. I'm not going to say he did it supposedly. I paid him to get a paralegal to answer these things the way they should be answered[.]

settlement agreement with Life Advance. Aug. 9 Tr. 11:8-13; *see also* ECF No. 285.[4] Although Mr. Walsh failed to comply with the supplemental production deadline, he did eventually produce a copy of the $7,500 check that Mr. Walsh made out to Mr. Nicholson's company U.S. Energy Concepts, as well as copies of the same text message exchanges that Mr. Walsh had previously provided to the Court.

Additionally, to gather more evidence regarding the authorship of the false statements filed with the Court, the Court decided to hold a third Show Cause hearing against both litigants, and to call Leon-Qiyam Pogue as the Court's witness at the hearing. *See* ECF No. 289. The Court called Mr. Pogue to explain the details of whether he was hired to perform legal work in this matter, who hired him, and the source of any payments made to him for legal work. *See id.* at 7.

The Court held the third Show Cause hearing on October 12, 2021, and Mr. Pogue appeared and testified. ECF No. 296. Following the hearing, the Court took under submission the matter of sanctions related to the false statements contained in Mr. Walsh's Motion for OSC (ECF No. 215).

The Court has now considered the documentary and testimonial evidence and determines that sanctions are warranted against both Mr. Walsh and Mr. Nicholson for their respective roles in the filing of false statements with the Court, for the reasons more fully set forth below.

\\

\\

---

[4] Mr. Nicholson did timely provide the Court with a copy of Mr. Walsh's resignation letter from the board of CEDI, as well as documentation of Mr. Nicholson's mother's medical emergency that precipitated his failure to appear for the August 2 hearing date. Mr. Nicholson provided no other documents, but he explained during the Show Cause Hearing that due to his mother's ongoing medical needs, he had not had the time to review his text messages and other written communications to find all required materials. *See* Aug. 9 Tr. 9:15 – 10:14.

## II.    LEGAL STANDARD

A party who submits false pleadings to the Court may be sanctioned for improper conduct pursuant to several different sources of authority, including (1) Rule 11(b) of the Federal Rules of Civil Procedure; (2) 28 U.S.C. § 1927; or (3) the Court's inherent authority. *See Garza v. Chavez*, No. CV 10-7658-VBF MAN, 2014 WL 3571721, at *20 (C.D. Cal. Mar. 4, 2014), *report and recommendation adopted*, No. LA CV 10-07658-VBF, 2014 WL 3572148 (C.D. Cal. July 18, 2014) (discussing these three avenues to sanction improper conduct); *Montgomery v. Etreppid Techs.*, LLC, No. 306CV0056PMPVPC, 2008 WL 11401773, at *1 (D. Nev. Apr. 1, 2008) (discussing the "variety of sanctions [that] may be imposed by a federal court when it is determined that false evidence has been presented[,]" including Rule 11 sections and inherent power sanctions). *But see Arnold v. Cty. of El Dorado*, No. 2:10-CV-3119 KJM GGH, 2012 WL 3276979, at *4 (E.D. Cal. Aug. 9, 2012), *report and recommendation adopted*, No. 210CV3119KJMGGHPS, 2012 WL 13046344 (E.D. Cal. Sept. 27, 2012) (finding that "[t]here is no specific rule which discusses sanctions for perjury" and concluding that the sanctions available derive "from the inherent power of the court") (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)).

Rule 11(b) applies to signed writings with the Court, and provides, in pertinent part:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> > . . . [and]
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Fed. R. Civ. P. 11(b)(1), (3).

The Court also has statutory authority pursuant to 28 U.S.C. § 1927 to require anyone

"who so multiplies the proceedings in any case unreasonably and vexatiously . . . to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The imposition of sanctions under § 1927 requires a finding that the person against whom the sanctions are imposed acted "recklessly or in bad faith[.]" *United States v. Blodgett*, 709 F.2d 608, 610 (9th Cir. 1983) (citation omitted). Notably, section 1927 sanctions may be imposed on a *pro se* party, not just attorneys. *Wages v. I.R.S.*, 915 F.2d 1230, 1235-36 (9th Cir. 1990).

Similarly, under the Court's inherent power, the court may levy sanctions, including attorney fees, when a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 776 (1980)); *see also* CivLR 83.1(a) ("Failure of counsel, or of any party, to comply with these rules, with the Federal Rules of Civil or Criminal Procedure, or with any order of the court may be grounds for imposition by the court of any and all sanctions authorized by statute or rule or within the inherent power of the court, including, without limitation, dismissal of any actions, entry of default, finding of contempt, imposition of monetary sanctions or attorneys' fees and costs, and other lesser sanctions").

The Court's inherent power "is 'both broader and narrower than other means of imposing sanctions.' [] On the one hand, the inherent power 'extends to a full range of litigation abuses.' On the other, the litigant must have 'engaged in bad faith or willful disobedience of a court's order'" to levy sanctions including attorney fees pursuant to the Court's inherent power. *Fink*, 239 F.3d at 992 (quoting *Chambers*, 501 U.S. at 46–47). "Before awarding [attorney fees] sanctions under its inherent powers, [] the court must make an explicit finding that [the conduct at issue] 'constituted or was tantamount to bad faith.'" *Primus Auto. Fin. Servs. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (quoting *Roadway Express*, 447 U.S. at 767).

\\

\\

### III.    DISCUSSION

Before turning to the imposition of sanctions, the Court will recount the specific false statements at issue. Mr. Walsh first revealed that his Motion for Order to Show Cause and the attached Declaration contained false statements during the June 1, 2021 hearing on the Motion. *See* ECF Nos. 252, 262. Specifically, Mr. Walsh confirmed during the hearing that counsel for Life Advance, Russell De Phillips, and Life Advance's principal, Craig Stack, have never asked him to sign any declaration stating any facts whatsoever about this litigation. This testimony conflicts with the following allegations in Mr. Walsh's Declaration (ECF No. 215):

> 2. I sadly report that Life Advance's principal Craig Stack and its attorney Russell Dephillips are attempting to get me to lie for them and intentionally omit information to assist them win this case against the other parties.
>
> . . .
>
> 4. After the $50,000 payment and after I was dismissed from the case, in September of 2020 Craig Stack, the owner of Life Advance, and Russell Dephillips, the attorney for Life Advance, contacted me and asked me to sign declarations on their behalf. I was surprised to learn that the statements they want me to make were blatantly false and a clear attempt by Life Advance to suborn perjury from me.
>
> 5. I was asked to attest that Life Advance was innocent and a bona fide purchaser of the key-man Policy. . . .
>
> . . .
>
> 11. When I refused to declare that they were not lawful purchasers Craig and Russell became very angry with me and berated me by stating that they had paid me $50,000 for my cooperation and that I needed to comply or face legal consequences and monetary damages.
>
> . . .
>
> 13. I was also asked to make a declaration that Mickey Nicholson was not an owner of California Energy Development Inc. However, this is also false. . . .
>
> . . .
>
> 15. Life Advance is putting extraordinary pressure on me, threatening to sink me legally and financially. After completely terrifying me with legal costs and being sued again, I returned the settlement check to my previous attorney Elliott Kanter and told him to return the settlement money because I am not interested in being threatened and I lack the health to continue being threatened by Life Advance. . . . [S]hame on Life Advance for threatening me

for not lying on their behalf.

16. Life Advance proclaims they can make me say whatever they want because my testimony was purchased. . . .

17. If I were to comply with their request for false testimony, it would be me submitting perjury in exchange for bribery and I am not willing to do that.
22. I now pray that the Court prevent Life Advance from harassing me any further[.]

*Id.* at 10-14.

## A. Mr. Walsh is subject to Rule 11(b) sanctions for filing false statements with the Court

Although there are conflicting accounts about who drafted the filings at issue, John Walsh does not deny that he signed the Declaration containing false statements. *See* July 13 Tr. 12:14-13:23; Aug. 9 H'rg Tr. 28:18-20 (Walsh testimony that he signed the Declaration). Mr. Walsh's consistent explanation for signing and filing the documents with the Court is that it was getting late and he was in a hurry to file them on time, and he has even stated he filed them without reading them. *See* July 13 Tr. 3:19-4:2 ("I paid [Mickey Nicholson] to get a paralegal to answer these things the way they should be answered, and I had left early that day, and – and I knew we were short on time. It was getting dark and late. And – and when I saw what was submitted, I couldn't believe it."); 13:23 ("I signed it. I didn't read this"); Aug. 9 H'rg Tr. 16:14-17:5 ("And I saw that [declaration], and . . . I looked at the signature, and it looked like my signature, but I know that this was in a hurry. I've had a difficult time communicating with Mickey Nicholson. . . . [C]ommunication with him was very quick"); 31:3-4 ("This was signed very quickly because they had to take it to the Court because it was going to be late"); ECF No. 270 at 1 ("I am at fault for not reviewing a couple of incorrect statements on my declaration. I was in a hurry to beat the traffic as it was getting dark out and my sight is degenerating.").

Therefore, whether or not he authored the documents at issue, Mr. Walsh's actions warrant the imposition of sanctions pursuant to Rule 11(b). It is undisputed that Mr. Walsh

signed and submitted a filing to the Court without "certif[ying] that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that the filings were "not being presented for any improper purpose" and that "the factual contentions have evidentiary support[.]" Fed. R. Civ. P. 11(b)(1), (3).

If the Court determines that Rule 11(b) has been violated, the Court "may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation" after giving notice and a reasonable opportunity to respond. Fed. R. Civ. P. 11(c)(1). Mr. Walsh's *pro se* status does not exempt him from imposition of Rule 11 sanctions, although the Court must take his *pro se* status into account in determining whether his actions were reasonable. *Warren v. Guelker*, 29 F.3d 1386, 1390 (9th Cir. 1994) (citation omitted). *But see W.V. ex rel. N.V. v. Encinitas Union Sch. Dist.*, 289 F.R.D. 308, 313, 314 (S.D. Cal. 2012) (explaining that a *pro se* party cannot be sanctioned for filing or maintaining legally frivolous claims under Rule 11(b)(2), but can be sanctioned under Rule 11(b)(1) for signing, filing, submitting, or advocating filings "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation"). The test of whether a person's actions were reasonable is an objective one; a showing of subjective bad faith is not required. *Yagman v. Republic Ins.*, 987 F.2d 622, 628 (9th Cir. 1993). *See also Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir. 1994) (explaining that Rule 11 sanctions cannot be avoided by a "pure heart and empty head" defense).

The Court finds Mr. Walsh's actions were not objectively reasonable, even taking into account his *pro se* status. Mr. Walsh has admitted repeatedly that the assertions in the Declaration he signed and filed with the Court are not true. *See, e.g.*, Aug. 9 H'rg Tr. 19:4-9 (Mr. Walsh explaining that the declaration "get[s] into accusing Life Advance for what they're trying to force me to do, they never did really try to force me"); 32:20-25 ("One hundred percent this [declaration] was so good, but when we get in, coming down, Life Advance blaming—putting pressure—saying what they were saying, and after I got to reading this and—I just—I couldn't believe it. I couldn't. This was so good, until this

part"). As discussed above, Mr. Walsh has also admitted that he did not read (or did not carefully read) the documents before signing and filing them. July 13 Tr. 3:19-4:2 and 13:23; Aug. 9 H'rg Tr. 31:3-4.

Mr. Walsh is responsible for the contents of his Declaration, and he was required to make an inquiry that was "reasonable" under the circumstances that the factual contentions therein had evidentiary support, and that they were not being presented for any improper purpose. He did not do so.

First, the Court finds the statements in the Declaration were presented for the improper purpose of interfering with the settlement agreement between Mr. Walsh and Life Advance. The false accusations that Mr. Stack and Mr. De Phillips were attempting to suborn perjury and were harassing Mr. Walsh were improperly presented to this Court to support Mr. Walsh's refusal to comply with the settlement agreement—indeed, the same Declaration was filed separately as an attachment to Mr. Walsh's meritless opposition to Life Advance's motion to enforce the settlement agreement. *See* ECF Nos. 213, 215, 262. Moreover, as the Court has explained, the false accusations contained in the Declaration could seriously harm the professional reputations of both Mr. Stack and Mr. De Phillips, and the accusation of suborning perjury in particular threatens Mr. De Phillips's reputation as an attorney and his ability to practice law. *See* Aug. 9. H'rg Tr. 6:8-7:9 (explaining that the false accusations in the Declaration amounted to "using the Court for an improper reason to try to gain an advantage in litigation based on lies," and explaining in particular the Court's concern that the Declaration "falsely accused people of wrongdoing that could affect them professionally and their ability to practice law, in particular . . . Mr. De Phillips."). Therefore, the Court finds that Mr. Walsh has violated Rule 11(b)(1) by signing and filing a false Declaration that was presented to the Court for the improper purpose of gaining an advantage in the litigation, which needlessly increased the cost of litigation by forcing opposing counsel Mr. De Phillips and the opposing party representative Mr. Stack to defend themselves against baseless and damaging accusations.

"[T]he terms of Rule 11 are mandatory, and where the certification required by Rule 11 has been violated, sanctions must be imposed. However, the type and amount of sanction remain within the discretion of the Court." *Himaka v. Buddhist Churches of Am.*, 917 F. Supp. 698, 710 (N.D. Cal. 1995) (citing *Golden Eagle Distributing Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1536, 1540 (9th Cir. 1986)).

Although Mr. Walsh is ultimately responsible for signing and filing his Declaration and shall face sanctions for that misconduct, the Court is troubled by the compelling evidence that Mr. Walsh did not draft the Declaration himself. The Court has expended many hours and Court resources to develop the evidentiary record to determine the appropriate sanctions to impose on Mr. Walsh, and whether any other parties may have been involved and should be subject to sanctions for their role in vexatiously multiplying the litigation. Thus, before determining the amount of sanction to be imposed on Mr. Walsh, the Court will address the evidence that other people were involved in presenting the false statements to the Court.

**B. Whether Mr. Walsh authored the false statements**

The Court has thoroughly reviewed the filings at issue and has compared them to other documents that Mr. Walsh has drafted and submitted to the Court while proceeding *pro se*. The Court's comparison shows that the Motion for OSC and attached Declaration do not match his style of writing and significantly exceed his apparent grasp of legal issues. Based on its analysis, the Court concludes by a preponderance of the evidence that Mr. Walsh did not draft the Motion for OSC and Declaration containing false statements.

The Court will give illustrative examples, but notes that these examples are by no means exhaustive. First, Mr. Walsh's written response to the Court's Order to Show Cause (ECF No. 270) is in the form of a letter to both judges assigned to the case, with attached printouts of sections of the California Insurance Code with handwritten notes. The letter is written in informal language, e.g., "Yes, I am at fault for not reviewing a couple of incorrect statements on my declaration. I was in a hurry to beat the traffic as it was getting dark out and my sight is degenerating." *Id.* at 1. The content of the letter also demonstrates that Mr.

Walsh's legal knowledge is limited. For example, Mr. Walsh seems to have the mistaken impression that the interpleader Plaintiff in this action, Prudential Life Insurance Company, selected the judges who are assigned to the case. *See id.* ("I can see why PRUCO had you handle this case. I'm not a lawyer."). Mr. Walsh also attached a hodgepodge of materials to the letter that had no apparent relevance to the Show Cause Order, including portions of the California Insurance Code, a newsletter from the University City neighborhood noting that April 6, 2021 had been declared "John Walsh Day" by the San Diego City Council, a distorted faxed copy of the final paragraph and signature lines of the settlement agreement between Mr. Walsh and Life Advance, a Certificate of Dissolution signed by James Roberts and submitted to the Secretary of State in August 2016, purporting to dissolve CEDI, and a copy of a $5,707.06 check Mr. Walsh paid to CEDI on January 4, 2017. *Id.* at 9-12. In his letter, Mr. Walsh's only explanation of the attached materials is that he has "[e]nclosed [] some of my Holiday resting learning. Ins. Code 10113.1.2.3." *Id.* at 1. The documents unrelated to the insurance code are not explained.

Other filings submitted by Mr. Walsh after he was no longer represented by an attorney reflect a similar lack of understanding of the facts and the law in the case, lack of formality in formatting and language, and conflations of separate issues. To give another example, following the August 9 Show Cause Hearing, the Court issued an Order Setting a Deadline of August 23, 2021 to Supplement Document Production to the Court (ECF No. 285), which in relevant part directed Mr. Walsh to submit a copy of the $7,500 check that he testified he had given to Mr. Nicholson to draft the documents at issue. Rather than merely submitting a copy of the $7,500 check as ordered, Mr. Walsh also submitted a copy of the Court's July 14, 2021 Order to Show Cause Directed to Mickey Nicholson (ECF No. 276), covered in handwritten notes. Mr. Walsh's notes primarily dealt with the issue of the validity of the settlement agreement between Mr. Walsh and Life Advance, an issue the Court had already resolved on June 16, 2021 in its Order granting Life Advance's Motion to Enforce the Settlement Agreement, and which was no longer before the Court. *See* ECF No. 262. Although Mr. Walsh did include a copy of the $7,500 check, Mr. Walsh also

attached the same distorted faxed copy of the final paragraph and signature lines of his settlement agreement with Life Advance that he had previously attached to his letter addressed to the judges assigned to the case. This copy contained handwritten notes related to the settlement agreement, such as, "drafting party LA [Life Advance] no force or effect"; "no equal hand. Elliott [Kantor, Mr. Walsh's former attorney] sent to LA"; and "LA was called Kantor did not have a share of drafting he wanted to be sure before he cashed the $50k check." Reflective of the same informal style, Mr. Walsh also attached a handwritten note on lined paper stating, "Your Honor – I never expected you to receive the agreement prepared by LA. I returned the agreement & check to Kantor's office per his sec. call to me. I expected a call from my atty. & shocked since I didn't & receive the check from LV. Shocked there is no 7 day recision [sic] clause. Sorry for what this puts you thru John."

Mr. Walsh's testimony at both Show Cause hearings similarly demonstrated that Mr. Walsh's ability to grasp the posture of the case and the legal questions at hand is far more limited than the apparent ability of the author of the Show Cause Motion and Declaration containing the false statements. Repeatedly, when the Court asked Mr. Walsh to explain why he should not be sanctioned for filing the false statements at issue, Mr. Walsh raised arguments related to his settlement agreement with Life Advance and the substance of the underlying interpleader case rather than responding to the Court's questions. *See, e.g.*, July 13 Tr. 15:5-22:24 (Mr. Walsh testifying at length regarding his settlement agreement with Life Advance and the merits of his pre-settlement position as an interpleader defendant in the case, in response to the Court's inquiry asking him to state "exactly what you want me to know about why you think you shouldn't have to pay for Life Advance's attorney's fees related to your false declaration?"). Mr. Walsh still did not seem to grasp the issue at hand after several attempts by the Court to clarify and to redirect him. *See id.* at 19:8-12 ("I understand that you're speaking to kind of the case in general, but my question for you is: Is there anything you want to say to convince me that I shouldn't make you pay Life Advance's attorney's fees that they incurred as a result of your false declaration?"); 20:8-12 ("Mr. Walsh, you're not responding to my question. And if you don't [] have a reason

why I shouldn't make you pay their attorney's fees, that's fine."); 20:17-20 ("I appreciate that you feel like – you have feelings about how Prudential conducted themselves, but the issue today is you filed a false declaration with the Court.").

Based on the Court's firsthand observation of Mr. Walsh during its numerous hearings on this issue, the Court finds by a preponderance of the evidence that he was not the author of the false statements at issue. Of course, that does not end the inquiry regarding who did draft the filing. The Court must therefore examine Mr. Walsh's initial claim that Leon Qiyam-Pogue drafted the Motion and Declaration, as well as Mr. Walsh's subsequent claim that Mr. Nicholson drafted the Declaration.

**C. Whether Leon Qiyam-Pogue had a role in filing the false statements**

As discussed, Mr. Walsh initially claimed during the June 1, 2021 hearing that a paralegal named "Leon Pique" drafted the false declaration. The Court later learned that the person referred to by Mr. Walsh as "Leon Pique" is in fact Leon Qiyam-Pogue. The Court subpoenaed Mr. Pogue to testify at a hearing on October 12, 2021. ECF No. 296. Mr. Pogue appeared at the appointed date and time, was placed under oath, and provided testimony to the Court to aid in its fact-finding.

Mr. Pogue explained that Mr. Walsh paid him approximately $1,000 to prepare a motion to set aside default, although he did not think the motion was filed in this case. Upon questioning by counsel for Life Advance, Mr. Pogue confirmed that he had also drafted, signed (with Mr. Walsh's authorization), and filed Mr. Walsh's motion for an extension of time to reply to Life Advance's motion to enforce the settlement agreement, filed on November 19, 2020 at ECF No. 202 in this matter. By comparing the two Walsh signatures, the Court has been able to determine that the motion to set aside default that Mr. Pogue prepared, signed, and filed for Mr. Walsh was indeed filed in this case on June 6, 2019, at ECF No. 80. Mr. Pogue testified that he believes the motion for extension of time filed on November 19, 2020 (ECF No. 202) was the last document he filed for Mr. Walsh in this case.

Relevant to the question of who prepared the document with the false statements,

Mr. Pogue testified that he has never had a conversation with Mr. Walsh regarding Life Advance purportedly attempting to force Mr. Walsh to sign a declaration that would require Mr. Walsh to perjure himself, and has never seen any evidence of the same. Mr. Pogue did acknowledge that he discussed with Mr. Walsh possible grounds to avoid his settlement with Life Advance when helping Mr. Walsh draft documents, but he does not remember discussing any coercion. Mr. Pogue further testified he does not know either Mickey Nicholson or Jason Voelker.

Having considered Mr. Pogue's testimony at the hearing and observed his demeanor firsthand, the Court finds his testimony credible that he did not prepare the filings containing the false statements at issue. Mr. Pogue was forthcoming and cooperative during the hearing, confirming without any reservations that he has performed legal work for Mr. Walsh in connection with this case, but maintaining that he was not involved in drafting the documents at issue.

Mr. Pogue's testimony is consistent with the Court's own review of the filings that Mr. Pogue admitted to preparing and its comparison of those documents to the documents at issue. The filings that Mr. Pogue did prepare in this case contain a mix of different fonts and styles, large portions written entirely in capital letters, case law and Rules of Civil Procedure that were apparently copied and pasted from other sources, and numerous typos. *See generally* ECF Nos. 80, 202. Additionally, each motion contains a final paragraph entitled "Declaration of John J. Walsh" that is in the body of the motion rather than attached as an exhibit to the motion, which is atypical. ECF No. 80 at 5; ECF No. 202 at 4. In contrast, both of the Walsh Declarations containing the false statements at issue here were included as separate attachments to the Walsh Opposition and Motion for OSC (respectively), with their own captions, footers, and numbered paragraphs, which is the standard way to present declarations to the Court. *See* ECF No. 213 at 14-19; ECF No. 215 at 9-15. The Walsh Declarations containing the false statements are also written in a more professional and polished manner, without the formatting, font, and stylistic shifts or typos that mark the Pogue filings.

Based on the Court's firsthand evaluation of Mr. Pogue's credibility and demeanor, and the Court's finding that the written filings corroborate his testimony, the Court determines by a preponderance of the evidence that Mr. Pogue was not the author of the false statements at issue.

**D. Whether Mickey Nicholson had a role in filing the false statements**

As discussed, after initially claiming during the June 1 hearing that Mr. Pogue drafted his Declaration containing the false statements at issue, Mr. Walsh later testified during the July 13 Show Cause hearing that he paid Mr. Nicholson $7,500 to prepare the Declaration attached to his Motion for OSC:

> The Court: So who actually prepared the statements in your declaration?
>
> Mr. Walsh: Mickey Nicholson. I'm not going to say he did it supposedly. I paid him to get a paralegal to answer these things the way they should be answered[.]

July 13 Tr. 3:19-21. *See also* Aug. 9 Tr. 26:19-25 (Walsh testimony that he paid Mr. Nicholson $7,500 "to have someone prepare these documents"). Mr. Walsh has maintained that position ever since. However, Mr. Nicholson denies having any role in preparing or filing the false statements at issue.

As noted above, the Court must make a "specific finding of bad faith" before issuing inherent power sanctions. *See, e.g.*, *United States v. Stoneberger*, 805 F.2d 1391, 1393 (9th Cir. 1986); *Yagman v. Republic Ins.*, 987 F.2d 622, 628 (9th Cir. 1993). An explicit finding of bad faith "is especially critical when the court uses its inherent powers to engage in fee-shifting." *Primus Auto. Fin. Servs.*, 115 F.3d at 648. Bad faith can be established "by 'delaying or disrupting the litigation or hampering enforcement of a court order.'" *Id.* (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978)). "Clearly, committing perjury is acting in 'bad faith.'" *Arnold*, 2012 WL 13046344, at *4. However, "inadvertent" conduct, such as "an oversight or ordinary negligence[,]" will not support the imposition of inherent power sanctions. *Fink*, 239 F.3d at 992-93 (citing and quoting *Zambrano v. City of Tustin*, 885 F.2d 1473, 1483, 1485 (9th Cir. 1989)).

As for the standard of proof for a bad faith finding, many courts have noted that there is no Ninth Circuit case requiring a finding of bad faith to be by clear and convincing evidence. *See, e.g.*, *In re REMEC Inc. Sec. Litig.*, No. 04-CV-1948-MMA (AJB), 2009 WL 10673010, at *6 (S.D. Cal. Sept. 25, 2009) ("[N]o Ninth Circuit case has applied a 'clear and convincing' standard when imposing sanctions for 'bad faith' conduct under the court's inherent powers"); *Erum v. Cty. of Kauai*, No. CIV. 08-00113-SOM-BMK, 2008 WL 2598138, at *7 (D. Haw. June 30, 2008) ("No Ninth Circuit case has required the finding of bad faith to be by clear and convincing evidence"). *See also Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010) ("The parties dispute whether a bad faith finding must be supported by clear and convincing evidence. This court has not addressed the burden of proof required for a sanctions award.")

Some courts have accordingly applied the preponderance of the evidence standard when evaluating whether a litigant acted in bad faith. *See, e.g.*, *In re REMEC Inc. Sec. Litig.*, 2009 WL 10673010, at *13, *15 (applying the preponderance of the evidence standard to an allegation of bad faith and request for sanctions under the Court's inherent power); *In re Silberkraus*, 253 B.R. 890, 913–14 (Bankr. C.D. Cal. 2000), *subsequently aff'd*, 336 F.3d 864 (9th Cir. 2003) (indicating that "the normal standard of proof in civil matters—proof by a preponderance of the evidence" is the appropriate standard to apply to inherent power sanctions under Ninth Circuit law, but noting that the evidence of bad faith in that case met the "clear and convincing standard" in any event). *But see Gurvey v. Legend Films, Inc.*, No. 09-CV-00942-AJB-BGS, 2013 WL 12090309, at *4 (S.D. Cal. Apr. 8, 2013) (suggesting that the "clear and convincing" standard is appropriate because "[a]lthough the Ninth Circuit has yet to address the burden of proof required for an inherent powers sanctions award, it has analyzed several sanctions cases under a 'clear and convincing evidence' standard," and collecting cases where the Ninth Circuit declined to resolve the question of the applicable standard because clear and convincing evidence supported the finding of bad faith either way) (citing *Lahiri*, 606 F.3d at 1219; *In re Lehtinen*, 564 F.3d 1052, 1061 n.4 (9th Cir. 2009), *abrogated on other grounds In re*

*Gugliuzza*, 852 F.3d 884, 898 (9th Cir. 2017); and *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1143 n.11 (9th Cir. 2001)).

The Court "has 'broad fact-finding powers' with respect to sanctions, and its findings warrant 'great deference.'" *Primus Auto. Fin. Servs.*, 115 F.3d at 649 (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1366 (9th Cir. 1990) (en banc)). Such deference extends to the Court's credibility determinations. *Hernandez v. City of El Monte*, 138 F.3d 393, 398 (9th Cir. 1998). *See also F.J. Hanshaw Enters., Inc*., 244 F.3d at 1144 (concluding the district court had sufficient evidence to find a litigant acted in bad faith, even under a "clear and convincing evidence" standard, in part because the Court determined the litigant's testimony was not credible, and its finding in that regard was a factual finding entitled to "great deference").

Here, the Court finds that clear and convincing evidence shows that Mr. Nicholson acted in bad faith by providing Mr. Walsh with the documents containing the false statements that were filed with the Court, and by helping to interfere with Mr. Walsh's settlement agreement with Life Advance. The Court has reached this conclusion based on a careful evaluation of all the evidence at hand, including the sworn testimony of both Mr. Walsh and Mr. Nicholson, the Court's observation of Mr. Nicholson's evasive demeanor during the August and October hearings, the corroborating evidence that Mr. Walsh wrote a $7,500 check to Mr. Nicholson's company only six days before the documents were submitted to the Court, the lack of evidence to corroborate Mr. Nicholson's alternative explanations for the purpose of either the $7,500 check or his visit to Mr. Walsh's home to obtain his signature on documents in the fall of 2021, the written communications between the two men indicating they were working together in the litigation, and the parallels between the documents filed by Mr. Walsh and filings submitted by Mr. Nicholson, including very similar legal interpretations of the force and effect Mr. Walsh's settlement agreement with Life Advance. The Court will go through all of this evidence in detail.

Both Mr. Walsh and Mr. Nicholson produced copies of a $7,500 check that Mr. Walsh made out to Mr. Nicholson's company, U.S. Energy Concepts, on December 8,

2020, only six days before the filings containing the false statements at issue were received by the Court on December 14.[5] After Mr. Walsh testified during the August 9 Show Cause Hearing that he had paid that amount to Mr. Nicholson to prepare the at-issue filings for him, the Court asked Mr. Nicholson under oath whether Mr. Walsh's assertion was true. Aug. 9 Tr. 35:1-2. Mr. Nicholson gave the following alternative explanation to the Court:

> Mr. Nicholson: Mr. Walsh is an investor of multiple companies of mine. Mr. Walsh has given me over $40,000. So the answer to that question, did he give me – yes, but it's investing in – I have more than one company. So Mr. Walsh is an investor of over six years with me and my companies. Did Mr. Walsh personally hand me? No, he did not. He invested and handed over money to my companies.

Id. 35:4-10. Mr. Walsh denied that the money was intended as an investment in one of Mr. Nicholson's companies. Id. 36:20-23.

Not only is there documentary evidence corroborating that Mr. Walsh paid Mr. Nicholson $7,500 six days before the at-issue documents were filed, but the Court also finds that Mr. Nicholson's alternative explanation for the payment is not credible. Mr. Nicholson provided no documentation whatsoever to support his alternative explanation, such as text messages or emails between him and Mr. Walsh regarding the investment. Mr. Nicholson explained in an email to the Court that Mr. Walsh did review a number of documents in connection with his investment, including an ownership agreement with law firm Procopio Cory Hargreaves & Savitch, LLP ("Procopio"), the prospectus, an algorithm developed by a person named Jason Breshears, and other proprietary information, but that Mr. Breshears instructed Mr. Nicholson not to leave any documents with Mr. Walsh. Mr. Nicholson offered to produce the documents to the Court under seal, claiming that the documents were proprietary and possibly subject to attorney-client privilege or to a non-disclosure agreement that Mr. Nicholson signed with Mr. Breshears, but he never did so.

---

[5] A redacted copy of the $7,500 check is attached to this Order as Exhibit A.

Nor did he produce any other evidence to corroborate this version of events, such as written communications with Mr. Walsh regarding the investment.

When counsel for Life Advance questioned Mr. Nicholson regarding the US Energy Concepts business during the October 12, 2021 hearing, Mr. Nicholson stated that the business was organized in Delaware as an LLC, but that he was not sure whether it was registered to do business in California. When counsel for Life Advance continued with the line of questioning regarding the membership of US Energy Concepts, when it was formed, and why there were multiple entities with that name registered in different states, Mr. Nicholson became visibly uncomfortable with the questioning, stated that the questions were irrelevant, and repeatedly requested a recess to consult with Procopio, the law firm that he stated was the only other member of the LLC.[6] The Court observed his demeanor to be evasive and nervous.

Other evidence leads the Court to question Mr. Nicholson's alternative explanation for the $7,500 payment as an investment in his company. Although the check is made out to "U.S. Energy Concepts," the memo line reads "Jason & Mickey." Thus, it is clear from the memo line that Mr. Walsh believed the money was meant for both Mr. Nicholson **and** Mr. Voelker, although Mr. Voelker is not a member of the Delaware LLC, according to Mr. Nicholson's own testimony. The memo line is consistent with Mr. Walsh's testimony that, although he believed Mr. Voelker was working as a legal assistant to CEDI's counsel

---

[6] The Court's own investigation shows there is no entity named "US Energy Concepts" registered in California, but there are companies by that name in both Oregon and Delaware. In Delaware, there are two separate entities named US Energy Concepts, Inc. and US Energy Concepts, LLC. US Energy Concepts, Inc. was incorporated in Delaware on October 31, 2016, and US Energy Concepts, LLC was incorporated in Delaware on May 16, 2019. In Oregon, Mr. Nicholson filed Articles of Organization for a company named US Energy Concepts, LLC on April 15, 2019, listing himself as the sole member. However, the Oregon LLC was administratively dissolved on September 17, 2020, and not reinstated until April 12, 2021. Therefore, the Oregon entity was dissolved at the time that Mr. Walsh wrote the $7,500 check to U.S. Energy Concepts.

and was thus unable to provide any legal assistance to Mr. Walsh, he nonetheless included Mr. Voelker's name on the check because he was disappointed and hoped that Mr. Voelker might be able to help him anyway.[7]

--------

[7] Mr. Walsh has indicated that Mr. Voelker may have indeed been involved in preparing the false statements. *See, e.g.*, Aug 9. Tr. 31:23 – 32:25:

> Mr. Nicholson: Okay. So my question again would be so you signed these documents without reading them and not knowing that under the penalty of perjury—and that's why we're here today—that you signed these and they're not true? Is that correct?
>
> Mr. Walsh: I didn't . . . I didn't do this. I didn't deliver this.
>
> Mr. Nicholson: Mr. Walsh, you said you signed – you signed this declaration. It's your declaration. You signed it.
>
> Mr. Walsh: To be honest with you–
>
> Mr. Nicholson: We're under oath.
>
> Mr. Walsh: – you people that – I know now what a declaration means. To me – to me it was a document. You prepared it. I paid you a lot of money to do this and answer it –
>
> Mr. Nicholson: Your Honor, can he please clarify who's you people, please?
>
> The Court: When you said "you people," who were you referring to?
>
> Mr. Walsh: I don't know. Voelker. I don't know – if you want me to say who helped you do this, Jesus wasn't there to do this. So I – I don't know. Somebody helped me do – I can't believe – it was – it was so good. One hundred percent this was so good, but when we get in, coming down, Life Advance blaming – putting pressure – saying what they were saying, and after I got to reading this and – I just – I couldn't believe it. I couldn't. This was so good, until this part – that's what I'm going through.

However, there is insufficient evidence to find that Mr. Voelker was involved under either a "clear and convincing" standard or a preponderance standard of evidence.

More significantly, the text messages between Mr. Walsh and Mr. Nicholson paint a clear picture that the two men were working together in this litigation as late as July 2021, long after Mr. Walsh settled his claims to the interpled funds and had been dismissed from the case.[8] On June 25, 2021, Mr. Walsh texted Mr. Nicholson, "Need to communicate have a[n] answer to respond to. You said you have ideas." That text message was sent 9 days after the Court issued its Order to Show Cause against Mr. Walsh for filing false statements with the Court, setting a deadline of July 6, 2021 for Mr. Walsh to file a written response. ECF No. 262 at 10. On July 1, 2021, Mr. Walsh again texted Mr. Nicholson, "I left you 2 voicemails 2nd required you to have a statement notarized Mail express Vons shopping center. Next to Clinic. and to me by 7-5-21. Noon." Again, Mr. Walsh appears to be referring to the written response to the Order to Show Cause that was due by July 6, 2021, and to be asking Mr. Nicholson to prepare the statement for him. The following day—the day the written response was due—Mr. Nicholson wrote to Mr. Walsh, "Can't talk, call you right back." On July 9, 2021, only four days before the second Show Cause Hearing against Mr. Walsh, Mr. Nicholson texted Mr. Walsh, "New twist in the case call me…." In response, Mr. Walsh wrote, "You are a new twist. I have [to be] careful of my heart. I will need to the name of the document preparer to see his explication of this quotes. If that was not the issue. I would have been out of this now completely now. To win for CED. And beat L.A., the 2 minute play. What is Ben's[9] opportunity for a field goal to win by 2 Pt." Mr. Nicholson responded, "You'll have to call me." Then, on July 10, 2021, only three days before the first Show Cause Hearing related to the false statements filed with the Court, Mr. Walsh texted Mr. Nicholson asking if he was "coming by today" because "I

---

[8] The copy of the text messages between Mr. Nicholson and Mr. Walsh provided to the Court by Mr. Nicholson (redacted to remove Mr. Walsh's cell phone number) is attached to this Order as Exhibit B.

[9] Counsel for CEDI is Benjamin Gale.

need to review your response."

Tellingly, Mr. Nicholson never questions or contradicts Mr. Walsh's requests that Mr. Nicholson provide a notarized statement to Mr. Walsh the day before Mr. Walsh's written response to the Order to Show Cause was due, that Mr. Nicholson said he had ideas for Mr. Walsh's response, or that Mr. Walsh needed "the name of the document preparer" for an explanation of the false statements in his Declaration to help him prepare for the Show Cause Hearing four days later. Additionally, Mr. Nicholson invited Mr. Walsh to call him in response to Mr. Walsh asking for "the name of the document preparer" and asking about CEDI's strategy to defeat Life Advance in the litigation.

Moreover, the Court finds it implausible that Mr. Nicholson and Mr. Walsh have produced the full extent of their written communications related to the Motion for OSC and Declaration filed in December 2020, Mr. Walsh's membership on and later resignation from the board of CEDI in the fall of 2021, or Mr. Walsh's settlement agreement with Life Advance that was signed in June of 2020 and the subject of a dispute in this Court until June 16, 2021. Mr. Nicholson produced only text messages spanning from June 16, 2021 to July 10, 2021—the same text messages that Mr. Walsh had already produced. Yet the text messages that were produced as well as Mr. Nicholson's own testimony and written response to the Order to Show Cause against him make clear that the two men had an established relationship well before June 16, 2021 and had communicated previously about the case in general and about Mr. Walsh's settlement agreement with Life Advance in particular.

For instance, Mr. Nicholson claims in his written response to the Court's Order to Show Cause that he visited Mr. Walsh's house in October 2021 to obtain his signature on the letter of resignation from CEDI, which is the underpinning of Mr. Nicholson's theory that Mr. Walsh confused his signature on the resignation letter with his signature on the Motion for OSC and Declaration containing the false statements at issue here. *See* ECF No. 281 at 8 ("I believe that [Mr. Walsh] may be confusing the signature on his resignation from CEDI (which I tirelessly struggled to obtain from him) with the signature on the

declaration that is subject to this OSC"). Yet there are no text messages or emails to corroborate that Mr. Nicholson brought the CEDI resignation letter to Mr. Walsh's house for his signature. Nor did either party produce any written communications between himself and any other person related to Mr. Walsh's membership on the board of CEDI, even though Mr. Nicholson states in his written response that it was a subject of extensive discussion among the CEDI board members both during and after the September 29, 2020 meeting of a quorum of CEDI shareholders:

> Walsh was questioned [by CEDI shareholders during the September 29, 2020 meeting] about his settlement agreement with Life Advance and asked whether he owed it any duty, had any conflict or was contractually prohibited from representing CEDI's interest. Walsh emphatically stated that there was no conflict. He assured the group that the settlement did not prevent him from serving on CEDI's board, he was adamant that he was not contractually beholden to Life Advance, and he promised fidelity to CEDI.
>
> After discussion, we all agreed that Walsh was unlikely in bed with Life Advance, and he was thereafter voted onto the board. Out of an abundance of caution he abstained from voting until the board could review his settlement agreement.
>
> Later, when CEDI obtained Mr. Walsh's settlement agreement, we learned that Walsh was entirely mistaken. Contrary to what Walsh had unequivocally told us, he had [as]signed his interest to Life Advance, he had agreed to acknowledge that Life Advance was the sole owner of CEDI's key-man policy, and he had agreed to work with Life Advance against CEDI's interests. When we learned this, we informed Walsh that he needed to immediately resign from the board.

ECF No. 281 at 7. Given Mr. Nicholson's own account of the shareholders' reaction to reviewing Mr. Walsh's settlement agreement with Life Advance, the Court does not find it credible that Mr. Nicholson had zero written communications with any other person regarding that settlement agreement, Mr. Walsh's membership on the board of CEDI, or his resignation therefrom.

Further corroborating Mr. Walsh's claim that Mr. Nicholson provided the at-issue documents to him to sign, the above excerpt and other portions of Mr. Nicholson's written response show that he and the author of the Motion for OSC and Declaration share a very

similar—albeit mistaken—understanding of the legal implications of Mr. Walsh's settlement agreement with Life Advance. Mr. Nicholson apparently agrees that requiring Mr. Walsh to comply with his settlement agreement amounts to suborning perjury:

> Walsh's real contention, as I understand it, is that **he cannot comply with the terms of the settlement agreement without perjuring himself.** However, instead of resolving the gravamen of that critical issue, the draftsman of his declaration created a side-show of errors and obtained an order from the court **requiring Walsh to comply with the very recitals Walsh swears he cannot truthfully abide by.** Mr. Walsh has now been ordered to meet with Life Advance's attorneys **and instructed to abide by the erroneous recitals notwithstanding his representation that his forced compliance suborns perjury.**

ECF No. 281 at 9 (emphasis added).

The notion that complying with the settlement agreement would require Mr. Walsh to commit perjury is also the core argument in Mr. Walsh's Motion for OSC and Declaration. *See* ECF No. 215, Walsh Decl. ¶ 4 ("[I]n September of 2020 Craig Stack, the owner of Life Advance, and Russell De[ P]hillips, the attorney for Life Advance, contacted me and asked me to sign declarations on their behalf. I was surprised to learn that the statements they want me to make were blatantly false and a clear attempt by Life Advance to suborn perjury from me"); ¶ 17 ("If I were to comply with their request for false testimony, it would be me submitting perjury in exchange for bribery and I am not willing to do that"). However, the Court has already rejected this argument, explaining in detail in its Order denying the Motion for OSC and granting Life Advance's Motion to Enforce the Settlement Agreement that Mr. Walsh is not required by the settlement agreement to affirm that Life Advance has any valid independent claim to the proceeds of the life insurance policy at issue in this interpleader action. Rather, he is required (1) ***not to interfere*** with Life Advance's prosecution of its claims to the proceeds of the policy; and (2) to cooperate with Life Advance in its prosecution of its claim to ownership of the policy and the policy proceeds, "including but not limited to providing written declarations ***regarding*** Life Advance's ownership of all rights to the [p]olicy and the [p]olicy proceeds[.]" *See* ECF

No. 191-2 at ¶¶ 4.F., 14 (emphasis added). With respect to the latter provision, the Court further explained that, because Mr. Walsh assigned his own claim to the policy to Life Advance as part of the settlement agreement, any cooperation with Life Advance under the agreement could be limited to explaining the factual basis of Mr. Walsh's own claimed right to collect the proceeds—a claim that Life Advance now owns. *See* ECF No. 262 at 7 (the Court's order denying Mr. Walsh's Motion for OSC and explaining that "Mr. Walsh's adamance that cooperating with Life Advance's prosecution of its claims—as required by the settlement agreement—would somehow necessarily require him to commit perjury (because he does not agree that Life Advance has a valid independent claim to the proceeds) is unpersuasive.").

Yet Mr. Nicholson still persists in arguing that Mr. Walsh's compliance with the settlement agreement requires him to "abide by erroneous recitals" and to "suborn[] perjury." ECF No. 281 at 9. That this fundamental misreading of the settlement agreement contained in the Motion for OSC and Declaration again rears its head in Mr. Nicholson's written response is persuasive evidence to support Mr. Walsh's claim that Mr. Nicholson was involved in preparing both filings.

Other language in the Walsh Motion for OSC and Declaration mirrors legal arguments made in filings submitted by Mr. Nicholson and Mr. Voelker. For example, both the Motion for OSC and the Declaration refer to a legal theory regarding whether Life Advance was an "innocent" and "bona fide purchaser" of the "key-man Policy" underlying this litigation. *See* ECF No. 215 at 3-4 ("Walsh was asked to attest that LIFE ADVANCE was an innocent third-party and a bona fide purchaser of the key-man Policy."); 10, Walsh Decl. ¶ 5 ("I was asked to attest that Life Advance was innocent and a bona fide purchaser of the key-man Policy. However this would be a lie."). This language mirrors Mr. Nicholson's language in his Declaration attached to his and Mr. Voelker's Joint Opposition to Life Advance's Motion for Summary Judgment, filed on June 1, 2020. *See* ECF No. 151-2 at 6-7, Nicholson Decl. ¶ 20 "At all times prior to the attempted transfer of the Policy, I contacted Life Advance and Craig Stack and informed them that they were not authorized

to purchase the Policy and **would not be *bona fide* purchasers** if they attempted to purchase said Policy.") (emphasis added); *see also* ECF No. 151 at 11, 14 (language in the body of the Nicholson/Voelker MSJ Opposition referring to the theory that Life Advance, Life Capital Group, and Craig Stack "would not be *bona fide* purchasers" of the "Policy."). These similarities in language and legal analysis support Mr. Walsh's claim that Mr. Nicholson provided him with the Motion for OSC and Declaration for his signature.

The parallels between filings submitted by Mr. Nicholson and the Walsh Motion for OSC and Declaration do not end there. Indeed, Mr. Nicholson and Mr. Voelker filed a "Joint Second Amended Cross-Complaint with Verified Shareholder Derivative Claims" ("Joint SAC") on December 18, 2020, only four days after the Walsh filings with the false statements at issue were submitted to the Court. ECF No. 209. Some of the language in the Joint SAC is identical or nearly identical to language in the Walsh filings submitted four days earlier, as outlined in the below chart:

| Walsh filings (ECF Nos. 213, 215), received by the Court Dec. 14, 2020 | Voelker/Nicholson Joint SAC (ECF No. 209), filed Dec. 18, 2020 |
|---|---|
| "WALSH contacted CRAIG STACK **on multiple occasions and advised** him not to purchase the Policy because **ROBERTS lacked the authority** to sell it and Roberts was being sued for theft by MICKEY NICHOLSON, the majority owner of CALIFORNIA ENERGY DEVELOPMENT INC." ECF No. 213 (Walsh Opposition) at 6. | "John Walsh also contacted Craig Stack **on multiple occasions and advised** Stack that **Roberts lacked the authority** to transfer CEDI'S Key-Man Policy." ECF No. 209 ¶ 32. |

| | |
|---|---|
| "Prior to its attempted purchase of CALIFORNIA ENERGY DEVELOPMENT'S key-man Policy, **WALSH contacted CRAIG STACK on multiple occasions and advised him not to purchase the Policy because ROBERTS lacked the authority to sell it** and Roberts was being sued for theft by MICKEY NICHOLSON, the majority owner of CALIFORNIA ENERGY DEVELOPMENT INC." ECF No. 215 (Walsh Motion for OSC) at 4. | "Nicholson later discovered that Roberts was wrongfully attempting to sell the Policy to a viatical broker named Craig Stack, who worked for Life Capital Group. **Nicholson called Mr. Stack on several occasions and advised him not to attempt any purchase of the Policy, as Roberts was not the owner of the Policy and had no authority to sell it**." ECF No. 209 ¶ 90. |

Notably, the second example above supports Mr. Walsh's testimony that Mr. Nicholson framed certain events in first person from Mr. Walsh's perspective in the Walsh Declaration, even though those events involved Mr. Nicholson and not Mr. Walsh. Specifically, during the July 13 Show Cause Hearing, Mr. Walsh testified:

> Mr. Walsh: And, you know, in looking through all the paperwork that I got – in there, it says 'I,' and it was referring to testimony that [Mr. Nicholson] had. And he was saying that in '16 and '17, he was talking to one of the – I think the president or the owner of Life Advance, telling him to bug off on making a settlement with Roberts. He says, you know, don't – and he said that a couple of times during '16 and '17. So that's where I think Mickey [Nicholson] probably got to talking to the paralegal [who drafted the Declaration] and said, "Throw this in there."

July 13 Tr. 9:2-11.

Here, Mr. Walsh appears to be referring to Paragraphs 6-7 of his Declaration attached to the Motion for OSC (the same paragraphs are included in the Declaration

attached to his Opposition to the Motion to Enforce Settlement Agreement), which read as follows:

> 6. In 2017 (before the transfer of the Policy) I spoke with insurance agent Chanowski (the agent responsible for the Policy) and discovered that Life Advance was attempting to illegally acquire the Policy. When I learned this I called Life Advance and spoke with Craig Stack and **told him on multiple occasions not to purchase the Policy because I had an interest in it and Roberts lacked the authority to transfer it or sell it.** I also told Stack that Roberts was being sued for theft by California Energy Development Inc. and that Roberts did not have any authority to sell the Policy. I also called Prudential and told them not to transfer the Policy to Life Advance.
>
> 7. In early 2018 Prudential informed me that a hold had been placed on the Policy and it would not be transferred. However, I learned from the policy broker Chanowski and Nicholson that Craig Stack was still trying to illegally acquire the Policy even though he was repeatedly told not to.

ECF No. 215 at 10-11, Walsh Decl. ¶¶ 6-7 (emphasis added). Again, the bolded portion above tracks some of the language in the Voelker/Nicholson Joint SAC quite closely, and also aligns with the claim in the Joint SAC that *Mr. Nicholson* "called Mr. Stack on several occasions and advised him not to attempt any purchase of the Policy, as Roberts was not the owner of the Policy and had no authority to sell it." ECF No. 209 ¶ 90. Moreover, the information that Paragraph 6 indicates Mr. Walsh shared with Mr. Stack (that Roberts lacked the authority to transfer or sell the policy, and that Roberts was being sued for theft by CEDI) is the same information contained in a letter dated December 2, 2016 purportedly from *Mr. Nicholson* to Mr. Stack. *See* ECF No. 151-2 at 53 (stating in pertinent part, "Please cease and desist in your efforts to acquire the policy. Jim Roberts is not authorized to sell or convey the policy and I am one of several rightful owners of the policy. . . . Mr. Roberts has attempted to sell this policy to others on numerous occasions and is being sued for pillaging and stealing company assets.").

Other documentation in the record further bolsters Mr. Walsh's testimony that the first-person claims in this portion of his Declaration were written from Mr. Nicholson's perspective. For example, ¶ 7 of the false declaration states that Pruco Life Insurance

Company "informed me that a hold had been placed on the Policy and it would not be transferred" in early 2018. ECF No. 215 at 11, Walsh Decl. ¶ 7. However, there is no documentation of any communications between Pruco and Mr. Walsh regarding a hold being placed on the policy. There is, however, documentation that counsel for Pruco, Kelly Fair, emailed and text messaged ***Mr. Nicholson*** in early August 2018 stating that there was a hold on the policy due to competing claims. *See* ECF No. 151-2 at 72, Ex. M to Voelker/Nicholson Joint Opposition to Life Advance's Motion for Summary Judgment (text message from Ms. Fair to Mr. Nicholson dated August 3, 2018, stating "Policy Ownership has not changed due to competing claims."); 75 (email from Ms. Fair to Mr. Nicholson dated August 4, 2018, stating "My understanding is that the CEDC/Roberts Policy is subject to a litigation hold. I will confirm status with my client Monday."). Paragraph 7 of the false declaration goes on to state that Mr. Walsh "learned from the policy broker Chanowski and Nicholson that Craig Stack [of Life Advance] was still trying to illegally acquire the Policy[.]" ECF No. 215 at 11, Walsh Decl. ¶ 7. Again, there is documentation in the record of a communication from Mr. Chanowski to Mr. Nicholson around the same time, but no documentation of Mr. Walsh communicating with Mr. Chanowski regarding the status of the policy. *See* ECF No. 151-2 at 75-76 (forwarded message from Chris Chanowski to Mickey Nicholson dated August 3, 2018, stating "change of premium m[a]de on 7/25/2018. There is no other changes except the owner is Life Advance LLC. They must have changed ownership within the last week. There has been no official changes on this account since last year 09 2017.").

Although no single piece of evidence is a "smoking gun," the cumulative weight of the evidence—as outlined above—is clear and convincing that Mr. Nicholson played a key role in false statements being filed with the Court in Mr. Walsh's Motion for OSC and Declaration, and that these false accusations were submitted for the sole purpose of interfering with the settlement agreement between Mr. Walsh and Life Advance. The filing of these falsehoods and the subsequent efforts by the Court to get to the bottom of what happened delayed the proceedings, threatened the integrity of the court process, resulted in

the expense of unnecessary time and resources by both the Court and the involved parties, and had very serious implications for the professional reputations of both Mr. Stack and Mr. De Phillips.

At all times throughout the Court's lengthy pursuit of the truth behind who prepared these filings, Mr. Nicholson behaved in an evasive and obstructive manner. The Court has reached this conclusion based not only on its firsthand observation of his demeanor, but also on his objective actions, such as delaying hearings at the last minute, failing to meet deadlines to provide required evidence to the Court, seeking recesses during difficult questioning about his business dealings, and, when he did eventually produce court-ordered documents, producing only materials he knew the Court already had in its possession, which the Court found highly unlikely to be the full scope of responsive materials. The text message communications between Mr. Walsh and Mr. Nicholson further establish that they were discussing the litigation and working together against Life Advance as late as July 2021—more than a year after Mr. Walsh settled with Life Advance.  By Mr. Nicholson's own account, he and other CEDI shareholders pushed Mr. Walsh to resign from the board of CEDI based on their own understanding that the settlement agreement between Mr. Walsh and Life Advance required Mr. Walsh "to acknowledge that Life Advance was the sole owner of CEDI's key-man policy[.]" ECF No. 281 at 7. The Court has already explained why this analysis reflects a mistaken understanding of the terms of the settlement agreement. However, regardless of the validity of that legal analysis, Mr. Nicholson is not entitled to interfere with Mr. Walsh's settlement agreement with Life Advance, and the evidence is clear and convincing that he attempted to do so by assisting Mr. Walsh in filing the Motion for OSC and Declaration with the Court, which falsely accused Life Advance's CEO and counsel of attempting to suborn perjury from Mr. Walsh.

For these reasons, the Court finds by clear and convincing evidence that Mr. Nicholson acted in bad faith, and that both he and Mr. Walsh should be sanctioned pursuant to the Court's inherent authority for vexatiously multiplying the proceedings due to their

involvement in the filing of false statements with the Court.[10] Accordingly, the Court will order both Mr. Walsh and Mr. Nicholson to pay fee-shifting sanctions to Life Advance.

**E. Appropriate amount of sanctions**

On July 6, 2021, counsel for Life Advance Russell De Phillips submitted a Declaration showing that he and his co-counsel Roy Carlson had incurred a total of $33,215.00 in attorney fees to brief Life Advance's Motion to Enforce Settlement Agreement and Mr. Walsh's Motion for OSC, another $2,110.00 in attorney fees to obtain compliance with the settlement agreement from Mr. Walsh, and total costs in the amount of $317.43. ECF No. 267. However, that Declaration was filed in response to the Court's June 16, 2021 Order enforcing the settlement agreement and requiring Life Advance to file the Declaration because "the parties' settlement agreement [] contains an attorney fee provision stating that if it becomes necessary to bring legal action to enforce the agreement, the unsuccessful party in such litigation 'shall pay reasonable attorney's fees and costs to the prevailing party in such action.'" ECF No. 262 at 9 (quoting ECF No. 191-2 at 20). Therefore, the Declaration pertains only to the attorney fees that Mr. Walsh should pay pursuant to the contractual agreement between the two parties, and not to the fees incurred in connection with the Court's investigation of the false statements filed with the Court and the propriety of imposing fee-shifting sanctions on the responsible parties pursuant to the Court's inherent powers. Since Mr. De Phillips filed the Declaration on July 6, counsel for Life Advance have also incurred additional fees in connection with the Court's investigation into the false statements, including by attending and questioning witnesses during the August 9 and October 12 hearings.

Therefore, counsel for Life Advance shall have until **April 13, 2022** to file and serve on both Mr. Walsh and Mr. Nicholson a supplemental declaration (1) detailing the costs and attorney fees, including the hourly rate, incurred by Life Advance since July 6, 2021

---

[10] Mr. Walsh is also subject to sanctions pursuant to Rule 11 and the attorney fee provision of his settlement agreement with Life Advance.

in connection with the Court's investigation of the false statements, and (2) setting forth Life Advance's position regarding the appropriate division of the fee shifting-sanctions between Mr. Walsh and Mr. Nicholson, based on the Court's factual findings herein. Mr. Walsh and Mr. Nicholson shall be permitted to respond to the supplemental fee declaration no later than **April 22, 2022**. Their responses should address their positions regarding how the sanctions should be apportioned between them. No reply shall be permitted.

## IV.   CONCLUSION

For the reasons set forth above, the Court finds that John Walsh shall be sanctioned pursuant to Rule 11(b)(1), the Court's inherent powers, and the attorney fee provision of his settlement agreement with Life Advance, LLC. The Court further finds by clear and convincing evidence that Mickey Nicholson has acted in bad faith and vexatiously multiplied the proceedings, such that fee-shifting sanctions pursuant to the Court's inherent authority are warranted against him.

As outlined above, counsel for Life Advance is **ORDERED** to file a supplemental declaration detailing the additional costs and fees it has incurred since July 6, 2021 related to Mr. Walsh's non-compliance with the settlement agreement, Life Advance's Motion to Enforce the settlement agreement, Mr. Walsh's Motion for OSC and attached Declaration, and the Court's subsequent investigation into the false statements contained in the Motion for OSC and Declaration. In the supplemental fee declaration, Life Advance must also set forth its position regarding the appropriate division of fee-shifting sanctions between Mr. Walsh and Mr. Nicholson, in light of the Court's factual findings in this Order.

**IT IS SO ORDERED.**

Dated: April 6, 2022

_____
Honorable Allison H. Goddard
United States Magistrate Judge

# EXHIBIT A

**JOHN JAMES WALSH CONSULTING**

SAN DIEGO, CA 92122-3741

90-7162/3222

2172

DATE 12/8/20

PAY TO THE ORDER OF U. S. ENERGY CONCEPTS $7,500

Seven Thousand Five Hundred DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO Jason A Mosley

# EXHIBIT B



**John Walsh**

Jun 16

Call me...thx

2:53 PM

Jun 20

I'm at the front door....

3:56 PM

Call me....Thx

3:59 PM

**J** You got 2. B kidding. This is Bull Shit. I was home   Didn't hear the door bell. And very concerned. You came sooner than I expected. I am concerned very very

6:30 PM

Ok....I waited 10-15 minutes...relax ...we can do this tomorrow...around lunch....

6:31 PM

Hey forgot something...call me

6:34 PM

Anti-Aging And Wellness Tijuana, Mexico

Enter message                                    Send

 **John Walsh** 

--- Jun 25 ---

**J** Need to communicate have a answer to respond to. You said you have ideas

12:54 PM

--- Jun 27 ---

**J** Went to early mass. All afternoon for you. Put me on court material web

12:48 PM

**J** I'm waiting for your visit. 3pm

3:07 PM

--- Jun 30 ---

**J** Dr off tomorrow no rush of course. Writing improved matter process. Think time. Write draft next day. After meditation 1st Cs review add. Think time next review add on. VIP finished. Not a same day for VIP matters. Dr John

1:30 PM

John Walsh 6027 Charae Street S. D. Ca. 92122

2:09 PM

--- Jul 1 ---

**J** I have an appraiser coming to the house at 11 today for lower interest rate and pmi. Shouts take less than 2 hours. The Dr is off today. My heart

Enter message  **Send**

**John Walsh**

loves last minute

8:52 AM

**J** Will call L A today.

8:59 AM

**J** I left you 2 voicemails 2nd required you to have a statement notarized Mail express Vons shopping center. Next to  Clinic. and to me by 7-5-21. Noon. Hope your mother is in the body and hands of the lord. Call a Church for a priest for her Extreunchion rites. I must go on. I had 4 Students in priva

View all

1:55 PM

Jul 6

Can't talk, call you right back.

5:36 PM

Jul 8

**J** R.  U.  Alive. Do  U. Remember Dr JOHN.  THE PERSON  giving people money.  Paying premiums. BET. You didn't think I would gagged in there 2 years ??  Did you.

12:50 AM

Jul 9

New twist in the case call me

Enter message                    Send

## John Walsh



didn't think I would gagged in there 2 years ?? Did you.

12:50 AM

Jul 9

New twist in the case call me...

12:58 PM

**J**  You are a new twist. I have robe to careful of my heart. I will need the name of the document preparer to see his explication of this quotes. If that was not the issue. I would have been out of this now completely now.

1:06 PM

**J**  To win
for CED. And beat L. A., the 2 minute play. What is Ben's opportunity for a field goal to win by 2 Pt.

1:11 PM

You'll have to call me

1:12 PM

**J**  I'm tired of your answering machine you are to busy with mother your land lord

1:26 PM

Jul 10

**J**  You coming by today. I need to review your response, during daylight or I'll head up your way. By 2. Traffic

5:18 AM

Enter message                                          Send